The Honorable Linda Chesterfield State Representative 12 Keo Drive Little Rock, AR 72206-4218
Dear Representative Chesterfield:
I am writing in response to your request for an opinion on the following questions:
 1. If a school district does not meet the state requirements under the Omnibus Quality Education Act of 2003, and federal requirements under the No Child Left Behind Act, can the state come in and take over that district?
2. Does this apply to the three districts in Pulaski County?
RESPONSE
In my opinion, assuming the statutory conditions have been met, I believe the answer to your first question is, generally, "yes." See the Arkansas Comprehensive Testing, Assessment, and Accountability Program Act, A.C.A. §§ 6-15-401 through -439 (Repl. 1999 West Supp. 2005 Acts 2005, Nos. 1229 and 2197). I must decline to answer your second question given the continuing effect of a consent decree to which the state is a party in a case styled Little Rock School District v. Pulaski CountySpecial School District et al., Case No. 4:82CV0866WRW — a decree subject to ongoing monitoring by the United States District Court for the Eastern District of Arkansas, Western Division.
Question 1: If a school district does not meet the state requirementsunder the Omnibus Quality Education Act of 2003, and federal requirementsunder the No Child Left Behind Act, can the state come in and take overthat district?
In my opinion, as a general proposition, the answer to this question is "yes."
The Omnibus Quality Education Act, enacted pursuant to Acts 2003, No. 1467 and codified, in part, at title 6, chapter 15, subchapter 4 of the Code (the "Arkansas Comprehensive Testing, Assessment, and Accountability Program Act"), authorizes the Board of Education to pursue various remedies when a school district is found to be academically or fiscally distressed. Subsection 6-15-425(b) of the Code (Supp. 2003) provides:
 Those public school districts identified by the department as failing to meet established levels of academic achievement shall be classified as being either in school improvement or academic distress, or both, as required by the program rules and regulations.
Subsection 6-15-426(a) (Supp. 2003) of the Code provides as follows:
 The State Board of Education shall develop a single comprehensive testing, assessment, and accountability program which shall identify and address all public schools or public school districts in school improvement or academic distress and shall be incorporated into the Arkansas Comprehensive Testing, Assessment, and Accountability Program rules and regulations which shall comply with the Elementary and Secondary Education Act as reauthorized by The No Child Left Behind Act of 2001.
Section 6-15-429 (Supp. 2003) provides in pertinent part:
 (a) A public school district identified as in "academic distress" shall have no more than two (2) consecutive school years from the date of receipt of notice of identification from the Department of Education to be removed from academic distress status.
 (b) The State Board of Education may at any time take enforcement action on any school district in academic distress status, including, but not limited to, annexation, consolidation, or reconstitution of a school district pursuant to § 6-13-1401 et seq. and the authority of this subchapter, except no public school district shall be allowed to remain in academic distress status for a time period greater than two (2) consecutive school years from the date of receipt of notice of identification of academic distress from the department.
 (c) If a public school district fails to be removed from academic distress status within the allowed two-year time period, the state board shall annex, consolidate, or reconstitute the academic distress school district prior to July 1 of the next school year unless the state board, at its discretion, issues a written finding supported by a majority of the board explaining in detail that the school district could not remove itself from academic distress during the relevant time period due to impossibility caused by external forces beyond the school district's control.
Finally, with respect to the state's authority to "take over" a school district found to be in academic distress, A.C.A. § 6-15-430 (Supp. 2003) provides:
 (a) The State Board of Education shall have the following authority regarding any public school district in academic distress:
 (1) To require the superintendent of the school district to relinquish all authority with respect to the district and to appoint an individual to administratively operate the district under the supervision of the Director of the Department of Education, with the cost to be paid from school district funding;
 (2) To suspend or remove some or all of the current board of directors and call for the election of a new school board for the school district, in which case the school district shall reimburse the county board of election commissioners for election costs as otherwise required by law;
 (3) To allow the school district to operate without the local school board under the supervision of the local school district administration or an administration chosen by the director;
 (4) To waive the application of Arkansas law, with the exception of the Teacher Fair Dismissal Act of 1983, § 6-17-1501 et seq., and the Public School Employee Fair Hearing Act, § 6-17-1701 et seq., or the Department of Education rules and regulations;
 (5) To require the annexation, consolidation, or reconstitution of the public school district; and
 (6) To take any other necessary and proper action, as determined by the state board, that is allowed by law.
With respect to districts determined to be in fiscal distress, A.C.A. §6-20-413 (Repl. 1999) provides:
 The State Board of Education is hereby authorized to develop indicators of fiscal distress in school districts and to promulgate the necessary rules and regulations so that the Director of the Department of Education shall provide technical assistance to school districts determined by the director to be in fiscal distress and shall ensure, to the extent possible, that a fiscal crisis will not interrupt the educational services provided to the students of a school district.
Subsection 6-20-1908(d) (Supp. 2003) provides:
 No school district shall be allowed to remain in fiscal distress status for more than two (2) consecutive school years from the date that the school district was classified as being in fiscal distress status.
Section 6-20-1909 (Supp. 2003) further provides:
 (a) In addressing school districts in fiscal distress, the Department of Education may:
 (1) Require the superintendent to relinquish all administrative authority with respect to the school district;
 (2) Appoint an individual in place of the superintendent to administratively operate the school district under the supervision and approval of the Director of the Department of Education and to compensate nondepartment agents operating the school district from school district funding;
(3) Call for the temporary suspension of the local school board;
 (4) Require the school district to operate without a local school board under the supervision of the local superintendent or an individual or panel appointed by the director;
 (5) Place the administration of the school district over to the former board or to a newly elected school board; or
 (6) Take any other action allowed by law that is deemed necessary to assist a district in removing criteria of fiscal distress.
 (b) The department may impose various reporting requirements on the school district.
 (c) The department shall monitor the fiscal operations and accounts of the school district.
 (d) The department shall require school district staff and employees to obtain fiscal instruction or training in areas of fiscal concern for the school district.
As the foregoing statutory provisions establish, as a general proposition, then, the state may "take over" a school district found to be in academic or fiscal distress under the recited circumstances.
Question 2: Does this apply to the three districts in Pulaski County?
This question raises issues that should properly be addressed by the United States District Court for the Eastern District of Arkansas, Western Division, which has approved and is monitoring a consent decree to which the State of Arkansas and the three Pulaski County school districts are parties in a case styled Little Rock School District v.Pulaski County Special School District et al., Case No. 4:82CV0866WRW.[1]
In Little Rock School District v. Pulaski County Special School Districtet al., 921 F.2d 1374 (8th Cir. 1990), the Eighth Circuit Court of Appeals charged the federal district court to maintain jurisdiction over and to monitor compliance with the settlement agreement that was finally approved in Little Rock School District v. Pulaski County Special SchoolDistrict et al., 971 F.2d 160 (8th Cir. 1992).
At issue in your question is the degree of control that the Department of Education might exercise over the three Pulaski County school districts pursuant to the statutes discussed in my response to your previous question in light of the provisions of the consent decree referenced in my previous paragraph. The decree, captioned the Pulaski County School Desegregation Case Settlement Agreement and dated March 1989, as revised September 28, 1989, contains the following language in Subsection II.J:
 The State, Joshua and LRSD [Little Rock School District] recognize that PCSSD [Pulaski County Special School District] and NLRSD [North Little Rock School District] are independent, sovereign desegregating school districts operating pursuant to court orders and agreements and that this agreement is both necessary and desirable to facilitate their desegregation activities as well as their cooperative desegregation activities with the LSRD and others.
(Emphasis added.) The scope and applicability of this provision has been a point of issue in the above referenced litigation, most recently in connection with an effort to "detach" part of PCSSD's existing territory to create a new, independent school district in the Jacksonville area, and might become so again if the Department of Education were to take control of one or more of the three districts.
In order to avoid encroaching upon exclusively judicial prerogatives, I believe it would be inappropriate for this executive-branch office to opine on the possible propriety of an ADE takeover of a district that is being monitored by a federal court pursuant to a consent decree. Compare
Ark. Op. Att'y Gen. No. 2003-311 (declining to opine on the enforceability of a pending consent decree in a state-court action). As the Eighth Circuit Court of Appeals has noted in considering the relationship between this consent decree and provisions of state law: "Because this case has been settled, the settlement agreement becomes, in a sense, a particularization of federal law applicable to these parties."Knight v. Pulaski County Special School District, 112 F.3d 953, 955 (8th Cir. 1997). With respect to the question of how the above quoted provision relates to provisions of state law that might authorize the Arkansas Department of Education (ADE) to "take over" one or more of the school districts, I can do no more than opine that it is the place of the federal district court charged with monitoring the settlement agreement to determine whether an ADE takeover of the sort authorized in the statutes discussed above would violate any of the conditions to which the state agreed in executing the settlement agreement. Indeed, this is precisely the approach taken in Knight, in which the federal circuit court reviewed the terms of the settlement agreement in order to test, and ultimately to reject, the district court's conclusion that the agreement addressed the authority of school district teachers to strike Id.
Applying this approach in the present case, I believe that if the district court were to determine that an ADE takeover would not violate the terms of the consent decree, then the provisions of state law discussed in my response to your previous question would apply.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB/JMD:cyh
[1] As the United States Supreme Court noted in Frew v. Hawkins,540 U.S. 431, 437 (2004):
 "Consent decrees have elements of both contracts and judicial decrees. Firefighters v. Cleveland, 478 U.S. 501, 519 (1986). A consent decree "embodies an agreement of the parties" and is also "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378 (1992). Consent decrees entered in federal court must be directed to protecting federal interests. In Firefighters, we observed that a federal consent decree must spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and must further the objectives of the law upon which the complaint was based. 478 U.S., at 525."